Filed 2/25/25  P.v. Fatemy CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SAYED ALIREZA FATEMY,<br><br>Defendant and Appellant. | C098121<br><br>(Super. Ct. No. 21FE015617) |

Defendant Sayed Alireza Fatemy appeals from his convictions of six counts of child molestation and one count of possessing child pornography.  He contends (1) defense counsel rendered ineffective assistance by predicating his trial strategy and opening statement on a misidentification of the true victim; (2) the trial court erred by allowing the investigating detective who had not been designated as an expert witness to testify regarding computer file placement and creation dates after a data recovery process has been performed on a computer; (3) counsel rendered ineffective assistance by not objecting to portions of the detective's testimony; (4) counsel rendered ineffective assistance by not calling an expert to testify that in rural Afghan culture, it is common

1

and not sexual for parents to touch a young son's genitalia to joke or tease; and (5) cumulative error.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

Prosecution

Christie Hirota is a detective with the Sacramento County Sheriff's Office. She is a member of the Sacramento Valley High-Tech Crimes Task Force, Internet Crimes Against Children. The National Center for Missing and Exploited Children (National Center) had issued a CyberTip to the Sacramento Valley Task Force based on information it had received from Dropbox that one of its accounts potentially contained child sexual abuse material (CSAM). Search warrants were executed against Dropbox, Google, Comcast, and Verizon. Detective Hirota reviewed the results of those searches.

Dropbox provided material from one of its accounts that consisted of six files. The files had been uploaded to Dropbox on May 20, 2021. Detective Hirota viewed the files, and four of them included videos of children involved in sex. Fifty-six videos and 14 images of CSAM were obtained from Dropbox.

Information in the Dropbox files indicated to Detective Hirota that defendant was the subscriber on the account and was using the account to store his files. The e-mail address of the user who uploaded the material was ali.banei@gmail.com. The username on the account was Ali Reza Fatemy. The username matched defendant's full name, Sayed Alireza Fatemy. The files from Dropbox also included videos and images of defendant's family and their government issued identification. Detective Hirota confirmed that the Comcast account for the IP address that matched the Dropbox account was linked to defendant. She also obtained from Comcast a physical address for that IP address.

Google provided Detective Hirota with information similar to what was in defendant's Dropbox account. There was a folder labeled "Telegram," and inside that folder were files labeled "bad" and "Do not open, personal." Telegram is a messaging app that can be utilized on a cell phone or a desktop computer. The files held CSAM. In a folder labeled "Google photos/family," Hirota found a video of defendant and his son, S.A. S.A. appeared to be approximately eight months old. He was wearing a "onesie" unsnapped at the bottom with no diaper. Defendant was holding and standing S.A. up by the armpits and reaching around and touching S.A.'s genitalia.

A search warrant was executed at defendant's home on September 9, 2021. Defendant, his wife, his five children, and a guest and his family were present at the time. S.A. was three days shy of his third birthday. Another son, S.E., was five years old. S.E. is severely autistic.

Officers seized a total of 11 electronic devices from defendant's home, including a Dell laptop, a Western Digital external hard drive found in a backpack, and a Samsung Galaxy Z cell phone. Data extraction was performed on the seized devices. The parties stipulated that the process used to extract data from the devices was forensically sound.

Fifty-five videos containing CSAM were recovered from the laptop. The file paths of those videos indicated the videos had been purposely placed into folders by a user. Another 210 videos depicting CSAM were recovered from the external hard drive. These videos had also been placed into folders, including one named "new folder/bad" and another named "new folder/bad/Telegram desktop." Seven videos depicting CSAM were recovered from the cell phone. The videos extracted from the laptop, hard drive, and cell phone were the legal equivalent of over 11,000 images of CSAM. Another 378 videos and 22 images that were recovered depicted persons whose age could not be determined and sexually explicit Japanese anime.

Twelve videos Detective Hirota viewed that were recovered from the laptop, hard drive, and cell phone were admitted into evidence, and portions of those videos were

published to the jury. Each depicted prepubescent children involving sex. The 12 videos were but a small portion of what Hirota viewed from the three devices.

Another four separate video files that Detective Hirota viewed were admitted into evidence as People's exhibits 2, 3, 4, and 5. These videos came from the material provided by Google. They were published to the jury. Each of these videos depicted defendant touching S.A.'s genitalia. Exhibit 2, filmed on April 21, 2020, showed S.A. sitting on a couch wearing only a T-shirt and defendant touching his genitalia. Exhibit 3, also filmed on April 21, 2020, showed defendant touching S.A.'s penis but in a different setting. Exhibit 4, filmed on May 20, 2020, showed S.A. nude from the waist down and lying next to defendant. Defendant was flicking S.A.'s penis and appeared to be biting his son's hand. S.A. would have been approximately one year old in this video. Exhibit 5, the oldest video, was filmed on May 11, 2019, and it shows S.A. being stood up and touched on his penis. S.A. was approximately seven months old in this video. Defendant's wife is present in some of the videos.

Detective Hirota interviewed defendant on September 9, 2021, the day the search warrant was executed. Defendant admitted he owned and controlled the Dropbox account. The e-mail address ali.vanei@gmail.com was his, as were the seized laptop, hard drive, and cell phone. Defendant stated he did not have CSAM on any of his devices. He had been to an Iranian website where he had seen CSAM. He did not know it was CSAM until he watched the videos, and he did not have time to delete them.

Defendant told Detective Hirota that his behavior with his son as shown on the videos was "a sign of being funny." At no point in the interview did defendant mention anything about cultural norms regarding touching a child's penis or that touching a child's penis was a treatment for autism or was used to calm a child down.

Mohammad Rafiq is a detective with the Sacramento Police Department. Detective Rafiq was born in Kabul, Afghanistan, and lived there until he was eight years old when his family migrated to the United States. He speaks both Farsi and English.

Farsi was spoken in his home even after the family moved to the U.S. Rafiq is an "official dual lingual employee" with the City of Sacramento. His role in defendant's investigation was to assist with interpretation if needed.

Detective Rafiq participated in Detective Hirota's interview of defendant initially to interpret. He stopped interpreting when defendant began speaking in English. Toward the end of the interview, he and defendant spoke with each other in Farsi.

At Detective Hirota's request, Detective Rafiq reviewed a series of videos to interpret what the people in the videos were speaking. Rafiq reviewed the videos and determined the participants were speaking in Farsi. When Rafiq watched one of the videos depicting defendant pinching or fondling a small child's penis, he heard the voices of a female and a male speaking in Farsi. The female said, translated into English, "You are moving your dick around like him. Dick is dick. You have never seen dick. Are you not lying?" The male voice said, translated into English, "yes" or "I agree."

On cross-examination, Detective Rafiq stated that Afghanistan has different languages. In Kabul where he was raised, Farsi, also called Dari, was the predominant language. Asked if he was aware that defendant's language was Hazaragi, Rafiq said he was not. He agreed it was fair to say that something in Dari might not necessarily translate into Hazaragi. He was not familiar with Hazaragi and did not know how much difference there was between that language and Dari. He interpreted the language spoken by the woman in the video to be Farsi, but he would not know if something was said in Hazaragi.

Defense

Defendant testified on his own behalf. He was born in 1987 in the "Waras District of Bamyan District" of Afghanistan. Around 1992, he and his family relocated to Iran to escape civil war. They returned to Afghanistan around 2000, and they immigrated to the

5

United States in 2016.  While in Afghanistan, defendant worked as a translator for the American government from 2010 to 2013.  He is of the Shia Muslim faith.

Defendant and his wife, M.A., have five children.  Their son S.E. is severely autistic.  Their son S.A. was born with a rash on his face, belly, and testicles.  S.A. did not like diapers and would always take them off.  It was normal for S.A. to go about the house without wearing a diaper or clothing on his bottom area.

Defendant speaks Hazaragi, a language primarily spoken in the Hazarajat region, a mountainous region in central Afghanistan.  He explained there are differences between Hazaragi and Dari.  Dari is spoken mostly in the county's large cities, such as Kabul. Defendant had no trouble understanding Detective Rafiq during their conversations.  But he did not think Rafiq's translation of his wife's comments in the video was a fair representation because there are different accents, and maybe Rafiq did not understand "the nature of that talk."

During the interview with Detective Hirota, defendant asked if he could see the videos of his son.  She did not show them to him.  Defendant thought that when Hirota talked about him pinching his son's penis, she was talking about his autistic son because he is naked all the time.  He did not know she was referring to S.A.  Defendant saw the videos of S.A. for the first time in the courtroom.  Also, Hirota did not ask him during the interview about cultural norms in Afghanistan of flicking or touching a son's penis or doing it as a method to calm a child down.

Defendant acknowledged that some of the videos shown to the jury depicted him touching or pinching S.A.'s penis.  He did that because in the village where he grew up, "parents make joke of their little kids all the time."  He harbored no sexual intent behind touching S.A.'s penis.  It was normal where he grew up for young children to run around wearing no clothes.  It was also normal for a parent, in a playful manner, to touch a child's penis without sexual intent.  They did it to joke or tease.  Defendant would also touch S.E.'s penis in an attempt to calm him down.  Defendant's wife was always present

6

when he played with his sons, and she never objected to him touching his sons' penises. She was present in some of the videos and raised no objection. Defendant agreed that in the videos, S.A. was not in need of calming. He filmed the touching "as a memory."

Defendant admitted he had a Dropbox account and a Google account. He denied storing anything in the Dropbox account. He used that account only to send mortgage documents to a lending company. He denied ever intentionally uploading or storing CSAM to his Dropbox account, and he had no idea how four files of CSAM were found in the account. Defendant also denied ever intentionally uploading CSAM to his Google account or storing CSAM on his cell phone or his external hard drive.

Defendant kept his Dell laptop in the master bedroom closet he had turned into an office. The computer was password protected, and only he and his two oldest children knew the password. He loaned the laptop to friends, and when he got it back, he saw it had new folders, but he did not search their contents.

Defendant stated he purchased the Dell laptop from Best Buy in 2019 as "used, open box," meaning it had been preowned and returned to Best Buy and was not sold in a box or with a user manual. After a while, the computer began running very slow, and it gave error messages when he tried to browse or open files. When he was unable to recover an Excel spreadsheet stored on the laptop, he realized the computer had a virus. He did a factory reset by using a "deep recovery software" he had to run twice.

The reset process recovered anything that had existed on the laptop's hard drive. He recovered the Excel file, but he was surprised to recover other files. In one folder, he saw videos of him and his wife. He renamed that folder "Do not open, personal." Inside that folder was another folder that contained videos. He tried to view them, but he received an error code. The laptop's media player gave an error message when it could not play a video. He renamed that folder "bad" because he was concerned it may have contained malware or viruses. He was surprised to see these folders. He stated they

7

came from the recovery. Defendant denied ever intentionally downloading CSAM to the Dell laptop.

Defendant purchased the external Western Digital hard drive that was found in the search of his home from Best Buy. At some point, defendant replaced the hard drive that came with his laptop with a new solid state drive. He used the old hard drive as an external hard drive, stored family pictures on it, and gave it to a friend who was going to Afghanistan to give it to defendant's family. Defendant denied ever storing CSAM on that external hard drive.

Other than from performing the recovery, defendant did not know how any of the CSAM got on any of his electronic devices or digital accounts. He had never seen any of the CSAM shown to the jury until that day in court. He had never knowingly downloaded CSAM to any of his electronic devices or to his Dropbox and Google accounts.

Defendant stated he never intentionally tried to access websites that might have CSAM. He admitted accessing an Iranian website a couple of times that had adult pornography. He never noticed any child pornography on the website. He denied telling the officers he had accessed an Iranian website he did not know had child pornography until after he had watched it.

Defendant stated he had not downloaded the Telegram app to his computer, but he had downloaded it to his cell phone. He used the app to stay in touch with members of an Afghani community group. He denied ever using the app to send or download suspected CSAM. He also was unaware there was any suspected CSAM on his cell phone. He never downloaded any such material to it.

On cross-examination, defendant agreed that in the four videos depicting him and his son S.A., he is the adult whose hand is touching S.A.'s penis. Each of the four videos depicts his son S.A. In three of the four videos, S.A. is not in need of calming down.

Defendant claimed that all his devices were synced together, but he could not explain why all the devices contained different CSAM. Defendant also stated that the external hard drive recovered by the officer was not the drive he took out of his laptop. He ran the recovery program on the old hard drive, not the new solid state drive he had installed in the laptop.

Imam Said Jawad Sajadi is an imam associated with a mosque and cultural center in Tracy. He was born in Afghanistan in 1976 and moved to the United States in 2003 at the age of 27 years old. He became an imam in 2005. He is familiar with Afghani culture, rituals, and practices.

Imam Sajadi testified that in Afghanistan, especially in the rural areas such as the Hazaragi region, it was common for young boys to go around their house with no clothes on. It also was not inappropriate and was in fact common for a parent or grandparent to touch or stroke a young boy's penis. A parent would do that to distract a screaming child or calm down a child who was acting out. It was also a way to show kindness to boys, who in Afghani culture are "more beneficial" and are the parents' "supporting future." Sajadi, however, did not have any personal experience with this kind of touching. Sometimes parents might film and save the act of stroking a child's penis, but he had never seen it, and he did not like to see it. After watching People's exhibits 2 and 5, Sajadi acknowledged that S.A. did not seem upset or in need of calming in those videos.

Imam Sajadi acknowledged that prior to trial, he had authored a letter in support of dismissing the case against defendant. For him, justice in this case was a dismissal. Sajadi did not know that police had seized devices from defendant that contained CSAM. Nonetheless, he did not believe defendant knowingly possessed CSAM, and there was nothing that could change his opinion about defendant's innocence. Sajadi knew defendant, and defendant was an active and beneficial member of the Afghan American community.

9

Nematullah Mossavi was born in Afghanistan in 1986 and immigrated to the United States in 2013 at the age of 27 years old. Mossavi knew defendant, and he was familiar with the cultural practices and norms in Afghanistan.

Mossavi testified it was normal for young boys in Afghanistan to run around with no clothing on in their homes. It was also a common practice for a parent or relative to touch or stroke a young boy's penis in a playful manner or to calm him down. Mossavi said such behavior was acceptable in Afghanistan until a boy turned 15 years old.

Mossavi stated defendant was trustworthy and had a reputation within the Afghan community for being a moral and honest person who cares for his family. Mossavi testified that defendant had told him he did a hard recovery of his computer in order to retrieve old documents he needed to give to Mossavi. Mossavi did not believe defendant had downloaded any of the CSAM that was found on his devices.

Sayed Mohammad Liaqat was born in Afghanistan in 1982, and he immigrated to the United States in 2016 at 33 years of age. Liaqat met defendant in 2017, but he had never seen defendant interact with his (defendant's) own children. Liaqat was with defendant when defendant bought his open-box computer at Best Buy.

Liaqat was familiar with Afghani customs and rituals. He testified it was common for parents of boys aged one to five years old to touch their sons' penises to calm them down or show affection. Such conduct was normal until the boy turned 14 or 15 years old.

In Liaqat's opinion, defendant is "a top person" who is well respected in the Afghan community. After being told about the evidence of CSAM on defendant's electronic devices and the charges against him, Liaqat maintained that defendant was still a good person, and the facts did not change his opinion of defendant. Liaqat also testified that if defendant had touched his (defendant's) son's penis, he had not done so with any sexual intent.

Rebuttal

Detective Hirota testified that when she reviewed the data extracted from defendant's laptop, there was no indication that any of the data from the device, including e-mails, photos, and documents, was from a previous user or any other person. The CSAM recovered from defendant's laptop had been created, accessed, or last modified between October 2020 and October 2021. The dates for all of the CSAM on the laptop were not identical, indicating that those images were put onto the laptop at different times, not all at one time as if they were being synced or backed up simultaneously. A deep recovery would show creation dates from the date of the recovery. The CSAM were also contained in different file paths.

From the data extraction, Detective Hirota determined that defendant's external hard drive had not been inside his laptop but had been attached to it externally by a cord or wirelessly. The external hard drive would not fit in the Dell laptop.

A folder found on the external hard drive labeled "Do no open, personal" contained videos of defendant and his wife having sex. The folder also contained a subfolder labeled "Bad." That subfolder contained 52 videos of CSAM. There was also a subfolder labeled "Telegram desktop" that contained CSAM. Another subfolder was labeled "My Wedding," and it contained photos of defendant's wedding.

The data extraction did not find any viruses on defendant's laptop. Detective Hirota stated that she and her team were not looking for evidence that a deep recovery had been performed on the laptop. She stated that in her interview with defendant, he did not say anything about his computer having gone through a deep recovery, and she had no reason to believe one had occurred. However, if a deep recovery had been performed, she would have seen files evidencing it, and she would have looked further. A recovery program would not necessarily put all the original data into the same folder it was stored

11

in previously. A person would have to take overt actions to create folders, which was done in this case.

Detective Hirota confirmed that defendant told her he had clicked a link in Telegram and downloaded CSAM but that he did not have time to delete it. Hirota also confirmed that the media players on defendant's laptop would play the type of files the CSAM was stored in.

Detective Rafiq on rebuttal stated he was born in Kabul, Afghanistan in 1976 and lived there for approximately seven and a half years. Since arriving in the United States, he has remained involved in the Afghan community. Rafiq testified it is illegal in Afghanistan to sexually abuse a child, and it is considered wrongful according to Muslim tradition. He was not aware of any cultural norms that approved of the stroking or fondling of a child's genitalia no matter the circumstances.

Detective Rafiq acknowledged, however, that he grew up in the capital city of Afghanistan and did not spend too much time in the rural mountainous areas. Rafiq further acknowledged that cultures and customs may vary from one region to the next.

<u>Verdicts</u> <u>and</u> <u>sentence</u>

A jury found defendant guilty of six counts of lewd and lascivious acts on a child (S.A.) under the age of 14 years (counts 1-6) and one count of possessing child pornography (count 7). (Pen. Code, §§ 288, subd. (a); 311.11, subd. (c).) The jury also found true in counts 1-6 the aggravating factor that the victim was particularly vulnerable. (Cal. Rules of Court, rule 4.421(a)(3).)

The trial court sentenced defendant to a state prison term of nine years, eight months: three years (the low term) on count 1, two years each (one-third midterm) on counts 4-6, and eight months (one-third midterm) on count 7. The court ran sentences of three years each (the low term) on counts 2 and 3 concurrently.

DISCUSSION

I

*Ineffective Assistance from Misidentifying the Victim*

Defendant contends trial counsel rendered ineffective assistance by basing his trial strategy and opening statement on the mistaken understanding that S.E. was the victim of defendant's abuse, when in fact it was S.A. The mistake, defendant argues, negated his actual defense based on the propriety of defendant's actions under Afghani cultural norms.

A.    Background

Summarizing the facts of the case in his trial brief, defense counsel stated the files obtained from Google allegedly depicted defendant "pulling and pinching" his son's penis. Videos obtained from defendant's laptop depicted defendant "touching and flicking" his son's penis. Counsel did not identify which son was depicted in the videos. But he discussed defendant's five-year-old son (S.E.) without naming him, and he explained S.E.'s autism and what steps defendant and his wife had taken to care for S.E.

At a pre-trial conference, the trial court asked defense counsel about his trial brief. Referring to the brief's references of defendant's five-year-old son having autism, the court asked, "Is that the son who is the subject of the charges here?" Counsel replied, "Yes." The court stated, "There was certainly no evidence of any autistic behaviors in the videos I viewed." Counsel stated that defendant would testify about his son's condition and behaviors. The court stated it knew defendant had five children, but it wanted to know "whether it was that child or another child." Counsel replied, "It's the son, yes."

By an in limine motion, defense counsel sought approval to introduce evidence of a " 'cultural defense.' " Witnesses would testify that in rural or mountainous areas of Afghanistan, it is common for a parent to stroke or flick a young child's penis in an effort to calm the child down. The witnesses would also testify that in Afghani culture, it was

13

common and not inappropriate for young children to be nude.  The trial court granted the motion.

In his opening statement, the prosecutor informed the jury that the victim of defendant's molestations was defendant's son, S.A. Doe.  S.A. was approximately three years old when officers executed the search warrant.

Defense counsel in his opening statement stated the alleged victim of the child molestation charges was defendant's son, S. Doe.  Counsel also stated that S. Doe is severely autistic.  The jury would learn that in the rural and mountainous regions of Afghanistan, it was not unusual for a father to touch or flick his son's penis in an attempt to calm the boy down, especially for children who were acting out.  Defendant would testify that this conduct was not done with sexual intent.

Defense counsel cross-examined Detective Hirota about her interview with defendant.  The following colloquy occurred:

"Q     During the course of the interview, you also asked Mr. Fatemy, in some of the videos it shows him pinching his son's penis.  Do you recall that?

"A     Yes.

"Q     You asked him about that, didn't you?

"A     Yes.

"Q     And his response was he wasn't trying to hurt the child.  Fair to say?

"A     Correct.

"Q     Were you aware, while you were questioning Mr. Fatemy, that that child suffers from a severe form of autism.  Did you know that?

"A     That's not the same child.

"Q     What is that?

"A     That's not the same child."

The prosecutor further probed this issue with Detective Hirota on redirect.  Hirota stated that defendant told her that S.E., and not S.A., was the autistic son.  Hirota

14

specifically asked defendant if the "child whose penis you were strumming like a guitar string" was his autistic son. Defendant said no. His older son S.E. was the autistic child.

During the defense case, defense counsel clarified with defendant that the videos showed his son S.A. Defendant stated that Detective Hirota would not show him the videos while she interviewed him. He believed that when Hirota spoke with him about his pinching his son's penis, she was talking about "my autistic kids because he was naked all the time." He did not know she was referring to S.A. The first time he saw the videos of S.A. was in the courtroom.

Defendant acknowledged that the videos showed him touching or pinching S.A.'s penis. Defendant said he did that because in the village where he grew up, "parents make joke of their little kids all the time." Defendant denied having any sexual intent for touching his son's penis. It was normal for a parent to touch a child's penis in a playful manner for joking or teasing without having sexual intent. Defendant said he would also use that method with his autistic son to calm him down. On cross-examination, defendant agreed it was S.E. who was autistic and not S.A.

Defense counsel's closing argument centered on defendant's actions toward S.A. Counsel argued that defendant "did not molest his son, [S.A.]" Counsel asserted the prosecution would have the jury believe that defendant's conduct "with his son, [S.A.], constituted inappropriate sexual contact[.]" Counsel argued the evidence showed that in certain parts of Afghanistan, it was not uncommon or inappropriate for a parent "to stroke a young child's penis, to flick it or touch it to calm them down or to play with them." Defendant "also used this method to calm down his extremely autistic son, [S.E.]"

The jury instruction on the aggravated factor of vulnerability stated the People alleged that when defendant committed the crimes, "the victim, [S.A. Doe], was particularly vulnerable." The verdict forms for each molestation count identified S.A. as the victim.

B.    Analysis

To establish a claim of ineffective assistance of counsel, defendant must first show counsel's performance was deficient because it " 'fell below an objective standard of reasonableness under prevailing professional norms.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)  Second, the defendant must show " 'resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*Ibid*.)  Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact we review independently.  (*In re Gay* (2020) 8 Cal.5th 1059, 1073.)

Assuming only for purposes of argument that defense counsel's performance was deficient, we conclude the deficiencies did not result in prejudice.  We may reject a claim of ineffective assistance for lack of prejudice without addressing whether counsel's performance was deficient.  (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)  Even if counsel had not confused S.A. with S.E. in his opening argument and earlier questioning, it is not reasonably probable defendant would have received a different outcome.

The evidence against defendant was overwhelming.  It unquestionably established that S.A. was the victim of defendant's molestations.  Defendant did not dispute that the videos depicted him touching S.A.'s penis.  The jury viewed the videos and from the totality of the evidence determined the touching was done with sexual intent.

Any confusion amongst the jurors engendered by counsel's opening statement was corrected by the evidence, by counsel's arguments, and by the court's instructions and verdict forms.  Defendant testified that the videos showed him touching S.A.'s penis, and that S.E. was his autistic son.  Counsel in his closing argument distinguished between S.A. and S.E., acknowledging that S.A. was the purported victim and S.E. was the autistic son.  The jury instruction on the aggravated factor of vulnerability and the verdict

16

forms for each molestation count identified S.A. as the victim. The jury knew that S.A. was the victim.

Defendant argues that counsel's opening statement prejudiced him because it created a false promise that denied defendant his actual defense. Counsel promised the evidence would show that defendant had touched his autistic son's penis to calm him down, an acceptable cultural practice in defendant's homeland. Counsel did not follow through with that promise. Instead, counsel's statement denied defendant of his actual cultural defense that in defendant's homeland, it was common and not sexual for parents to touch a young son's penis to joke or tease.

Counsel, however, fully presented defendant's cultural defense as it applied to S.A. Defendant testified he touched S.A.'s penis because in the village where he grew up, it was normal for a parent to touch a son's penis in a playful manner for joking or teasing without having sexual intent. Defendant also stated he would use that method to calm S.E. down. Additionally, defendant's character witnesses testified that defendant's touching his son's penis was a culturally sanctioned and nonsexual act of joking or teasing and was also used to calm down a boy. Counsel argued the same points in his closing argument. The jury thus heard and understood defendant's cultural defense as it applied to defendant's actions against S.A. Given the evidence and counsel's closing arguments, it is not reasonably probable defendant would have obtained a more favorable verdict had counsel not asserted in his opening statement that S.E. was the victim.

Defendant also argues that counsel's opening statement prejudiced his conviction under count 7 for possession of child pornography. The prosecution in its closing argument cited the videos of S.A. as evidence supporting count 7. That meant the jury could find defendant guilty on count 7 even if it reasonably doubted defendant had intentionally downloaded CSAM to his electronic devices. Defendant asserts that if counsel had not misrepresented his actual defense in the opening statement, it is reasonably probable that at least one juror would have found defendant not guilty on

17

count 7 by believing the CSAM resulted from defendant's running a deep recovery program on his laptop and by also concluding the videos of S.A. did not constitute CSAM. But as already explained, the jury fully understood that defendant's cultural defense applied to defendant's actions against S.A. The jury rejected the defense and found that defendant acted with sexual intent. The jury thus could indeed have determined that defendant's recording of S.A.'s molestations and possession of those recordings constituted possession of child pornography. It is not reasonably probable that defendant would have received a more favorable outcome on count 7 had counsel in his opening statement identified S.A. as the victim depicted in the videos.

Because defendant was not prejudiced by counsel's misstatements, there was no ineffective assistance of counsel.

II

*Detective Hirota's Testimony Regarding Data Recovery and Computer Files*

Defendant contends the trial court abused its discretion by allowing Detective Hirota to testify regarding data recovery and computer file creation and placement. He argues that Hirota's testimony was inadmissible as lay testimony because it involved matters outside common knowledge. Hirota was never designated as an expert witness, and the prosecution did not establish an adequate foundation for her testimony. Defendant argues the error violated his due process rights and was prejudicial under the federal and state standards of prejudicial error.

A.    Background

Detective Hirota testified she has worked for the Sacramento County Sheriff's Office for 21 years. Since 2013, as part of her job she has worked with the Sacramento Valley High-Tech Crimes Task Force, Internet Crimes Against Children. She is also a sworn deputy marshal on the FBI Violent Crimes Against Children Task Force. Besides her training to become a detective, she has taken numerous classes with the California

18

Department of Justice on basic computers. She is certified as an undercover operator for internet crimes against children. She has been trained on the CyberTip system. She regularly attends trainings conducted by the National Center on internet crimes against children and routinely corresponds with its personnel. Hirota estimated that since becoming a member of the Sacramento Valley Task Force, she has worked on over 1,000 cases involving child sexual exploitation, a majority of which involved CyberTips from the National Center.

Detective Hirota testified that the files found in defendant's Dropbox account were uploaded to that service at different times on May 19, 2021. After the prosecutor reviewed with Hirota her report of the data extracted from the laptop and the files in which the CSAM was found, the prosecutor asked her without objection, "A detective of your training and experience, do those file path locations from a laptop mean anything to you that's relevant to this investigation?" Hirota stated the locations meant the materials had been purposely placed into folders and subfolders by a user.

On cross-examination, Detective Hirota stated the CSAM was first downloaded onto defendant's devices on August 12, 2019, and the last download occurred on August 10, 2021. Defense counsel asked Hirota whether she considered herself a computer expert. Hirota said no.

On rebuttal, Detective Hirota testified there were no data of any kind located on defendant's laptop that could potentially have belonged to a prior user. She also stated the data extraction from the laptop provided creation dates for the files containing CSAM. They ranged from October 2020 to October 2021. The dates when the CSAM files on the laptop were created, modified, and last accessed were not identical. The prosecutor asked Hirota, "If you could, someone with your training and experience, what does that indicate to you if anything?" Defense counsel objected that the question was "[v]ague and ambiguous," but the court overruled the objection. Hirota then stated, "That

19

would mean that those images of CSAM were put onto the device at different times, not all at one time, as if it was being synched [*sic*] or backed up simultaneously."

Detective Hirota also testified that the CSAM was contained in different file paths. The external hard drive and the Google drive each contained a folder entitled " 'Do not open, personal' " that contained 31 videos of defendant and his wife having sex. Inside the "Do not open, personal" file was a subfolder labeled " 'Bad' " that contained 52 videos of CSAM. There was also a subfolder labeled " 'Telegram desktop' " that contained CSAM, and a subfolder labeled " 'My Wedding' " that contained wedding videos of defendant and his wife.

The prosecutor asked Detective Hirota if, in her review of the laptop data, she had looked for any evidence of a prior deep recovery. Defense counsel objected on the basis of lack of foundation, but the court overruled the objection. Hirota stated she was not looking for evidence of a deep recovery, and she had no reason to believe a deep recovery had occurred. Under cross-examination, however, Hirota stated she would have known if a deep recovery had occurred because she would have seen files consistent with that action, and she would have looked further. Depending on the recovery program used, the program does not put files back in the order they originally were in, but each recovery program does things differently.

On re-direct, the prosecutor asked Detective Hirota if all the CSAM files on the laptop had the same creation date. She said they did not. The prosecutor asked without objection, "What does that suggest to you as an investigator?" Hirota responded, "That they were placed on that particular device at different times." The following colloquy then occurred:

> "Q [the prosecutor] I want to ask you more about the file paths. [Defense counsel] was asking you about a deep recovery, and he asked you whether you could tell if there was a deep recovery or not, and you said yes because of file paths.

"Would you elaborate more?

"A [Hirota]    All of the images of child sexual abuse material were placed in folders specifically.  So when you get a computer, you, as the user, have to create folders, and when you create folders you have to right click and change the name of that particular file.

"So typically when you do recovery of documents or images, based on my experience, there's different ways, but one is it could potentially come in a folder that has everything in it individually.  It's not going to be placed in folders.

"Q     I want to get that very clear.  Based on your experience with recovery, data recoveries, it comes as a single package full of files, individual files, not folders.  Is that correct?

"[Defense counsel]: Objection.  Vague and ambiguous.  Lack of foundation.  This witness testified there are a number of different deep recovery programs that operate differently.

"THE COURT:      Overruled.

"[¶] . . . [¶]

"Q [the prosecutor]  I wanted to make sure I understood.  What I'm understanding – I'm trying to visualize it as a non-tech person.

"These are the ones you have seen.  You do a deep recovery.  It's completed.  And what is it that someone sees on their screen first in terms of the data that was recovered?

"[Defense counsel]: Same objection as before.

"THE COURT:      Overruled to the extent that she is aware of recovery programs through the work that she's conducted.

"[Hirota]:      So typically it will be a file folder that contains just a package of everything in there individually, as a single stand-alone document or image or video.  It will not be placed in multiple folders that you, as a user, have to overtly

21

make an action of creating a folder, labeling the folder.  Not only that, it's multiple folders that are deep in there – my personal, do not open, personal, as a folder, then bad as a folder, then wedding folders as another folder.

"A user had to create all of these folders to put all of these images that I personally saw that showed those file paths on different dates and different times.

"[¶] · · · [¶]

"Q     File paths and subfolder structures would not be present in just a data recovery?

"A     Correct.

"[¶] · · · [¶]

"Q     []  In this trial the defendant has already admitted, when he testified, that he is the one who created those folders, the actual folder and named them, Do not open, personal and bad.  What would that indicate to you, as a trained investigator, as it relates to this topic of whether there's a deep recovery or not?

"A     That he, himself, made overt actions to actually create those file names and put things into those folders.

"Q     Got it.  And would the birth dates or creation dates of those files be consistent or inconsistent with a deep recovery?

"A     If you are going to do a recovery, all of the dates would appear to be the same, and they are all different dates.

"Q     Got it.

"A     Unless he did deep recovery at a bunch of different times because there's a huge range of dates.  Unless he did it six, twelve times."

The trial court proposed instructing the jury with CALCRIM No. 332 regarding expert witness testimony.  It believed the imam qualified somewhat as an expert, and the prosecutor suggested that Detective Hirota also qualified as an expert.  Defense counsel objected in part because Hirota was not an expert, but he stated, "[I]t's not a strong

22

objection." The trial court gave the jury CALCRIM No. 332 as well as CALCRIM No. 333 regarding opinion testimony of a lay witness.

### B. Analysis

Defendant asserts that Detective Hirota's testimony regarding data recovery, including file placement after data recovery on a home computer, was inadmissible as lay witness testimony because it involved matters outside common knowledge. Unlike an expert witness's opinion, a lay witness's opinion testimony may rest only on common experience. Defendant argues that the issue of file placement after data recovery on a home computer concerns matters beyond common knowledge.

Defendant also contends the trial court erred when it overruled his lack of foundation objection to Detective Hirota's testimony about the data recovery process. Her testimony was inadmissible expert testimony because the prosecution did not establish an adequate foundation. Defendant asserts a foundation for expert testimony cannot be inferred based on general work in the field. The prosecution had to establish that Hirota qualified as an expert by having special knowledge, skill, experience, training, or education to testify on data recovery. Defendant claims the prosecution did not establish the requisite foundation, and the court erred in overruling his foundation objection.

Defendant argues the error was constitutionally prejudicial. The improper admission of Hirota's unsubstantiated expert testimony negated his defense that the CSAM resulted from the deep recovery he performed on the laptop, and it thus deprived him his right to have the jury determine his guilt or innocence on admissible evidence. Defendant also contends the error was prejudicial under the state standard of prejudice.

The Attorney General contends defendant has forfeited this argument. Defendant did not object to Detective Hirota's testimony regarding data recovery on the ground it was inadmissible lay opinion or that Hirota did not qualify to give such an opinion.

23

"Generally, a 'trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal.' (*People v. Dykes* (2009) 46 Cal.4th 731, 756; see Evid. Code, § 353.) The specific objection requirement 'must be interpreted reasonably, not formalistically.' (*People v. Partida* (2005) 37 Cal.4th 428, 434 [].) Its purpose is 'that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' (*Id.* at p. 435.)" (*People v. Guenther* (2024) 104 Cal.App.5th 483, 525.) " 'In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented.' " (*People v. Flores* (2020) 9 Cal.5th 371, 397.)

Defendant contends his lack of foundation objections to Detective Hirota's testimony about computer recovery and recovery programs were sufficient to inform the court and the prosecution that he was objecting based on Hirota's inappropriate lay testimony and the lack of her qualifications to testify as an expert. We disagree.

Defendant first objected when the prosecutor repeated Detective Hirota's testimony about data recoveries appearing as a single folder in a computer. The prosecutor asked Hirota whether, based on her experience with data recoveries, "it comes as a single package full of files, individual files, not folders. Is that correct?" Defense counsel stated, "Objection. Vague and ambiguous. Lack of foundation. This witness testified there are a number of different deep recovery programs that operate differently." The court overruled the objection.

This objection did not attack Hirota's status or qualification to render an expert opinion. Hirota had earlier stated without objection that different recovery programs run differently, and that depending on the program used, the program would not put recovered files back into their original order. The objection asked for a foundation to

establish which recovery programs Hirota was referring to that delivered their results in a single folder. The objection did not inform the court or the prosecution that counsel was challenging Hirota's status or qualification to testify concerning recovery programs.

Defendant's second objection was similar. The prosecutor, wanting to ensure he understood Detective Hirota's testimony about how recovery programs operate, asked Hirota, "These are the ones you have seen. You do a deep recovery. It's completed. And what is it that someone sees on their screen first in terms of the data that was recovered?" Defense counsel stated, "Same objection as before." The court overruled the objection "to the extent that [Hirota] is aware of recovery programs through the work that she's conducted."

The objection "before" was counsel's objection to the lack of foundation establishing which recovery programs Detective Hirota was referring to. The trial court limited her response to recovery programs with which she was familiar through her work. As with the first objection, nothing in this objection would have reasonably put the court or the prosecutor on notice that defendant was objecting to Hirota's status or qualifications to testify concerning recovery programs and their operation.

A defendant's failure to make a timely and specific objection on the ground asserted on appeal forfeits that ground. (*People v. Partida, supra*, 37 Cal.4th at pp. 433-444.) That is particularly true with objections to expert testimony. The failure to specifically object to an expert's qualifications forfeits the objection. (*People v. Morales* (2020) 10 Cal.5th 76, 98.) Defendant's objections did not present or preserve the arguments he makes here against Detective Hirota's testimony. Although defense counsel objected that Hirota was not an expert, the objection was insufficient to preserve the arguments on appeal because the objection pertained to jury instructions, not the testimony challenged on appeal.

25

## III

*Ineffective Representation by Not Objecting to Detective Hirota's Testimony*

Defendant contends his trial counsel rendered ineffective assistance by not objecting to certain portions of Detective Hirota's testimony as it related to count 7, possession of child pornography, for lack of foundation. Counsel did not object when Hirota testified that the file path locations disclosed in the extraction report meant the various files were "purposely placed into folders" by a user, and that she could tell the CSAM files did not come from the deep recovery because "[a]ll of the images of child sexual abuse material were placed in folders specifically."

Additionally, defense counsel did not make an objection on foundation grounds when Detective Hirota testified that the fact the CSAM files did not have the same creation, modification, and last-accessed dates meant the images were stored in the laptop at different times, and not all at the same time as if they had been synced or backed up simultaneously. Counsel also did not object when Hirota testified on cross examination that she could tell whether the CSAM on defendant's electronic devices had actually been accessed or reviewed, and that she would have known if a deep recovery had been performed by seeing files consistent with that and would have looked further.

Defendant asserts there was no foundation for this testimony, and thus defense counsel's failure to object to it was ineffective assistance. He claims there is no reason why counsel did not object to this testimony when the prosecution first solicited it. Also, admitting the evidence was prejudicial because the prosecution relied on the inadmissible testimony heavily in its closing argument. The evidence went to the heart of defendant's defense. Defendant asserts that had counsel objected and the trial court sustained the objection, the evidence would not have been admitted, resulting in a reasonable probability he could have obtained a better outcome.

Defendant cannot establish prejudice. Even if counsel had objected, it is not reasonably probable defendant would have obtained a more favorable verdict on count 7. The videos defendant made and possessed of him touching his son S.A.'s genitalia met the definition of unlawful CSAM. They were not the product of a deep recovery performed on his laptop. The jury rejected his defense that the videos depicted a culturally accepted practice, and it found defendant touched S.A. with sexual intent. The videos were thus evidence of defendant wrongfully and intentionally possessing CSAM and supported his conviction on count 7 regardless of his or Detective Hirota's testimony regarding any deep recovery. Counsel thus cannot establish the prejudice element of ineffective assistance on this claim.

IV

*Ineffective Representation by Not Calling an Expert Witness*

Defendant contends his trial counsel rendered ineffective assistance by not calling an expert witness on Afghani cultural norms to testify concerning defendant's touching S.A.'s penis as a joke and to tease. Counsel instead relied upon three of defendant's acquaintances whose testimony the prosecution impeached on cross-examination and attacked in closing argument due to their personal biases in favor of defendant. Defendant asserts the prosecution would not have been able to have dismissed his cultural defense had it been presented by an expert witness.

When examining an ineffective assistance of counsel claim and determining whether counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, we presume the performance " ' "fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125.) Defendant's burden to overcome this presumption is difficult to carry on direct appeal because the record often does not disclose the reason for counsel's action. (*People*

*v. Arredondo* (2019) 8 Cal.5th 694, 711.)  As a result, "we may reverse 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*Ibid*.)  " 'All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding.' " (*People v. Hoyt, supra*, 8 Cal.5th at p. 958.)

Whether to call certain witnesses is a matter of trial tactics unless the decision results from an unreasonable failure to investigate.  (*People v. Bolin* (1998) 18 Cal.4th 297, 334; *People v. Frierson* (1979) 25 Cal.3d 142, 163-164.)  " ' "[W]e accord great deference to counsel's tactical decisions" (*People v. Frye* (1998) 18 Cal.4th 894, 979), and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" (*People v. Scott* (1997) 15 Cal.4th 1188, 1212).  "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." ' " (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)  A claim that defense counsel rendered ineffective assistance by not calling certain witnesses " 'must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood for exonerating the accused.  [Citations.]  We cannot evaluate alleged deficiencies in counsel's representation solely on defendant's unsubstantiated speculation.' " (*Bolin*, at p. 334.)

Defendant contends there is no sound tactical reason for counsel not calling an expert witness on cultural norms.  Counsel likely believed the testimony of Imam Sajadi, Mossavi, and Liaqat regarding cultural norms in rural Afghanistan would be sufficient to establish a cultural defense to the child molestation charges.  But defendant argues that counsel should have known the prosecutor would discredit those witnesses due to their being defendant's close friends and ardent supporters.  Defendant thus claims that

28

counsel's decision not to call an expert on cultural norms was unreasonable and bore no tactical reason.

The difficulty here is there is no sworn testimony or declarations in the record establishing what a cultural norms expert would have stated or his or her likelihood of exonerating defendant. In his opening brief, defendant cites to scholarly articles, out-of-state cases discussing the use of cultural experts, including a reported case from Maine where witnesses, including two expert witnesses, testified that kissing a son's penis was common and nonsexual in Afghanistan (*State v. Kargar* (Me. 1996) 679 A.2d 81, 83), and other literature discussing the nonsexual touching of young sons' penises by parents in rural Asia. But none of these sources was presented to the trial court or made part of the record. They are thus outside the scope of our review on appeal.

Defendant mentions that in his statement for mitigation filed prior to sentencing, defense counsel submitted a letter of support signed by 52 born-and-raised Afghanis who stated that in Afghan culture, touching their sons' penises was the equivalent of tickling their sons on their stomachs. This letter, however, was not executed under penalty of perjury or submitted into evidence at trial.

Defense counsel made a tactical decision to rely upon the three Afghani witnesses to establish his cultural norm defense, and the witnesses in fact testified to that point. One was an imam respected in the Afghani community. That those witnesses may have been impeached is no different than presenting the testimony of any other witness, subjecting the person to cross-examination, and allowing the jury to decide the facts. That a better witness could have been presented does not by itself establish counsel rendered ineffective assistance. We are disinclined to second-guess defense counsel's tactical decisions.

Here, the record does not affirmatively disclose that counsel had no rational tactical purpose for not calling a cultural norm expert. Counsel was not asked for the reason he did not call an expert, and a satisfactory tactical explanation exists. Thus,

29

counsel did not perform below prevailing standards of reasonableness and did not render ineffective assistance.

## V

### *Cumulative Error*

Defendant contends the trial court's series of errors cumulatively resulted in a denial of due process. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) We must reverse when cumulative error deprives a defendant of a fair trial and due process. (*Ibid*.) However, where there are no errors to cumulate, such as here, we must reject defendant's cumulative error argument. (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 63, review granted Oct. 12, 2022, S275341.)

### DISPOSITION

The judgment is affirmed.

_____

HULL, Acting P. J.

We concur:

_____

MAURO, J.

_____

BOULWARE EURIE, J.

30